

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00328-CV

IN THE INTEREST OF J.D. AND
K.O., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. BRIEF BACKGROUND AND INTRODUCTION

After hearing testimony about the physical abuse suffered by three-year-old J.D., allegedly at the hands of Appellant Mother's boyfriend C.O., and after hearing testimony that Mother had refused to acknowledge C.O.'s role in the abuse and to extricate herself from him, the trial court terminated Mother's

---

[1]*See* Tex. R. App. P. 47.4.

parental rights to both her son J.D. and to her daughter K.O.[2]  Mother now appeals the judgment terminating her parental rights to her two children, arguing that the family code's dismissal deadlines in termination cases are unconstitutional,[3] that the trial court erred by denying her motion to extend the dismissal deadline, that Texas Family Code section 263.405(i) violates the separation of powers provision of the Texas constitution, that section 263.405(i) as applied to Mother violates the Due Process Clause of the United States Constitution, and that the evidence is legally and factually insufficient to support the termination of her parental rights.  We will affirm.

## II.  THIRD ISSUE

In her statement of points on appeal, Mother challenged only the legal and factual sufficiency of the evidence to support the termination of her parental rights and argued that subsections (b), (d), (g), and (i) of section 263.405 violate the separation of powers doctrine.  Mother, recognizing that her first two issues (regarding the section 263.401 dismissal deadlines) were not raised in her statement of points, argues in her third issue that Texas Family Code section

---

[2]The reporter's record spells K.O.'s first name with a "C."  In this opinion, we use the spelling found in the final judgment, which is also reflected in the style of this appeal.

[3]On January 17, 2012, notice was given to the Office of the Attorney General (OAG) in accordance with Texas Government Code section 402.010(b). Tex. Gov't Code Ann. § 402.010(b) (West Supp. 2011).  A copy of Mother's brief was also sent to the OAG.  No response was filed by the OAG.

263.405(i) is not a bar to her first two complaints because section 263.405(i) violates the separation of powers provision of the Texas constitution.

Former section 263.405(i) of the family code required an appellant to present to the trial court any issue that she intended to appeal in a statement of points. *See* Act effective Sept. 1, 2005, 79th Leg., R.S., ch. 176, § 1, 2005 Tex. Gen. Laws 332, 332 ("The appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of points on which the party intends to appeal or in a statement combined with a motion for new trial."), *repealed by* Act effective Sept. 1, 2011, 82nd Leg., R.S., ch. 75, §§ 5, 8, 2011 Tex. Gen. Laws 348, 349 (deleting subsection (i) but noting that former section 263.405 remains in effect for final orders rendered before September 1, 2011).[4] However, following our recent decision in *In re A.J.M.*, No. 02-11-00137-CV, 2012 WL 2877457, at *1 (Tex. App.—Fort Worth July 16, 2012, no pet. h.) (op. on reh'g) (en banc), we sustain Mother's third issue. *See generally Ross v. Union Carbide Corp.*, 296 S.W.3d 206, 221 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (Frost, J., concurring on en banc review) (stating that "'absent (1) a decision from a higher court or this court sitting en banc that is on point and contrary to the prior panel decision or (2) an intervening and material change in

---

[4]The final order of termination was signed on August 2, 2011. Because the order was signed before September 1, 2011, former section 263.405(i) controls this case. *See id.* Due to the repeal of former section 263.405(i), our holding in this appeal is limited to cases in which a final termination order was signed before September 1, 2011, and in which an appellate court opinion has not been handed down.

3

the statutory law, this court is bound by the prior holding of another panel of this court'"). We therefore review each of Mother's issues.

### III. MOTHER FAILED TO PRESERVE HER SEPARATION OF POWERS ARGUMENT REGARDING SECTION 263.401'S DISMISSAL DEADLINES

In her first issue, Mother argues that the artificial deadlines of section 263.401 violate the separation of powers provision of the Texas constitution and are void. To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a); *see also* Tex. R. Evid. 103(a)(1). If a party fails to do this, error is not preserved, and the complaint is waived. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g); *see also In re B.L.D.*, 113 S.W.3d 340, 354–55 (Tex. 2003) (holding that court of appeals must not retreat from error-preservation standards to review unpreserved error in parental rights termination cases), *cert. denied sub nom. Dossey v. Tex. Dep't of Protective & Regulatory Servs.*, 541 U.S. 945 (2004); *In re D.T.M.*, 932 S.W.2d 647, 652 (Tex. App.—Fort Worth 1996, no writ) (holding that even constitutional arguments are waived if not raised in the trial court). Because Mother was required to raise this constitutional challenge in the trial court and did not, she waived her right to assert it on appeal. *See In re D.W.*, 249 S.W.3d 625, 631 (Tex. App.—Fort Worth 2008), *pet. denied*, 260 S.W.3d 462 (Tex. 2008) (holding that mother's complaint, challenging section 263.401's

dismissal deadline as violative of the separation of powers clause of the Texas constitution, was not the type of challenge of facial unconstitutionality of a statute that could be asserted for the first time on appeal); *In re K.A.S.*, 131 S.W.3d 215, 231 (Tex. App.—Fort Worth 2004, pet. denied) (holding that because constitutional attacks on section 263.401 were not raised in trial court, parent had waived right to assert them on appeal); *see also In re Doe 2*, 19 S.W.3d 278, 284 (Tex. 2000) (holding that trial court lacked authority to consider separation of powers issue that was not properly presented to trial court). *But see Tex. Dep't of Family & Protective Servs. v. Dickensheets*, 274 S.W.3d 150, 161 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (stating that party could raise constitutional challenge to facial validity of statute for first time on appeal and holding that section 263.401 does not violate separation of powers clause in Texas constitution); *In re L.L.*, 65 S.W.3d 194, 196–97 (Tex. App.—Amarillo 2001, pet. dism'd) (holding that section 263.401 does not violate separation of powers clause in Texas constitution). We overrule Mother's first issue.

## IV. TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING MOTION FOR EXTENSION

Before the termination trial commenced, Mother asked for an extension, stating that she had completed her service plan, had achieved independent living from C.O., and needed "some time to demonstrate that [she] can maintain a safe and stable home" so that the children could be returned. The ad litem responded, "I'm adamantly opposed to that motion. [Mother] has had a year to

5

move out of the apartment from [C.O.] and decided to move out last week, if she even has moved out.  There is no . . . extraordinary circumstance that would say that we need to extend this case."  The Department concurred with the ad litem, requested that the motion for extension be denied, and reminded the court that the dismissal date was that day.  The attorney for C.O. stated that his client was in favor of granting the extension because Mother and C.O. had been separated for a month.  The intervenors, Mr. and Mrs. W., who were maternal great-grandparents of the children, did not object to the motion for extension.  After hearing the arguments of both sides, the trial court denied Mother's request.

In her second issue, Mother argues that assuming that the statutory dismissal deadlines do not violate the separation of powers provision of the Texas constitution, the trial court erred by denying her motion to extend the dismissal deadline.

A trial court must dismiss a suit affecting the parent-child relationship if it has not rendered a final order or granted an extension on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the Department as temporary managing conservator.  Tex. Fam. Code Ann. § 263.401(a) (West 2008). The trial court may grant an extension of up to 180 days if it finds that "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child."  *Id.* § 263.401(b).  Because an

6

extension of the dismissal date is similar to a continuance and because section 263.401(b) does not specify the appellate standard of review, we apply the abuse of discretion standard. *In re T.T.F.*, 331 S.W.3d 461, 476 (Tex. App.—Fort Worth 2010, no pet.); *D.W.*, 249 S.W.3d at 647.

Here, Mother argues in her brief that she had completed her services and had moved away from C.O. and that "*these circumstances* constituted extraordinary circumstances that necessitated the children['s] remaining in CPS'[s] temporary managing conservatorship." [Emphasis added.] Mother does not explain how allegedly completing her services and how allegedly moving away from C.O. constitute extraordinary circumstances, nor does she cite to any case law showing that any other court has found this type of circumstances to constitute extraordinary circumstances. Given Mother's delay in waiting a year to move away from C.O., we cannot say that the trial court abused its discretion by denying an extension of the statutory dismissal date so that Mother could have more time to demonstrate that she had disassociated from her child's abuser. *See D.W.*, 249 S.W.3d at 648 (holding that because mother presented no evidence when she presented her motion, she cannot show that the trial court abused its discretion by denying her motion to extend the dismissal deadline); *Shaw v. Tex. Dep't of Family & Protective Servs.*, No. 03-05-00682-CV, 2006 WL 2504460, at *8 (Tex. App.—Austin Aug. 31, 2006, pet. denied) (mem. op.) (holding that mother did not show that needing more time after failing to make

progress on service plan for eight months amounted to extraordinary circumstances). We overrule Mother's second issue.

## V. MOTHER'S DUE PROCESS CHALLENGE IS MOOT

In her fourth issue, Mother argues that section 263.405(i) as applied to her violates the Due Process Clause of the United States Constitution. Because we have sustained Mother's third issue challenging section 263.405(i) on separation of powers grounds and have addressed all of the issues that Mother has properly preserved for appeal, including those that were not raised in her statement of points, Mother has received all the process that she is due. We therefore overrule Mother's fourth issue as moot.

## VI. EVIDENCE IS SUFFICIENT TO SUPPORT BEST INTEREST FINDING

In her fifth issue, Mother argues that the evidence is legally and factually insufficient to support the termination of her parental rights. After setting forth the law for terminating parental rights under section 161.001(1)(D) and (E), Mother then narrows her issue as follows:

> In this case there are two primary issues for the Court to consider:
>
> 1) Was the evidence factually and legally sufficient to find that it was in the children's best interest not to return to [Mother]?
>
> 2) Was the evidence factually and legally sufficient to find that it was in the children's best interest to terminate all familial connections?

8

Mother's brief, however, does not mention the *Holley* best interest factors or the section 263.307(b) best interest factors and contains no argument explaining how the evidence is legally or factually insufficient to support a best interest finding under the *Holley* best interest factors or the section 263.307(b) best interest factors. *See* Tex. Fam. Code Ann. § 263.307(b) (West 2008); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Because a parent's rights to "the companionship, care, custody, and management" of her children are constitutional interests "far more precious than any property right," *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003), we nonetheless proceed to analyze the best interest arguments raised by Mother. We begin by reviewing the evidence from the trial.

## A. The Evidence at Trial[5]

### 1. History of Abuse

J.D. was born May 1, 2007. Mother and J.D. lived with Mr. and Mrs. W., who were J.D.'s great-grandparents, off and on until Mother started dating C.O. After Mother and J.D. moved in with C.O., J.D. frequently spent the night at his great-grandparents' house. During that time, Mrs. W. said that J.D. came in the front door at her home and said, "[C.O.] hurts me, mamaw," and then he showed

---

[5]The record, totaling approximately 500 pages, reveals that the termination trial was held on three dates: May 2, 2011; June 13, 2011; and June 16, 2011. Due to the six-week gap in the dates, the date the testimony was given will be provided when necessary to provide clarification.

her bruises. If J.D. accidentally wet his pants while at her home, he would say, "[Y]ou're not going to hurt me," and "Don't hurt me." J.D. also asked if Mrs. W. was going to hurt him when she put him in the bathtub. Mrs. W. thought that J.D.'s comments were odd.

Mrs. W. said that around July 2009, right after Mother got pregnant with K.O., Mrs. W. saw a black eye on J.D. and asked what had happened; she was told that he had run into a table. Several weeks passed, and then J.D. came over with another black eye. J.D. said, "[C.O.] hurts me." Mrs. W. called Mother, and she said that J.D. had run into the door at the laundromat. Mrs. W. did not think that was a plausible explanation in light of what J.D. had said.

Mrs. W. testified that two weeks prior to K.O.'s birth,[6] Mother arrived at her baby shower with two black eyes. Mother said that J.D. had kicked her. Mrs. W. noticed that Mother had bruises on her chest. Mrs. W. had previously seen bruises on Mother's legs and arms, and Mother said that she had run into a door or had bumped into a chair. Mrs. W. believed instead that Mother was being beaten by C.O.

When Mrs. W. kept J.D. for a week when K.O. was born, J.D. did not have any marks other than a fading bruise on his knee. However, when Mrs. W. picked up J.D. from Mother approximately a month later on Easter (April 4, 2010), the whole side of his face was black; Mrs. W. rated the injury to J.D.'s face

---

[6]K.O. was born on March 8, 2010.

10

on Easter as a seven or eight. J.D. said that one of C.O.'s friends had hit him, but Mother told Mrs. W. that J.D. was clumsy and had fallen out of the closet.

From April 4, 2010, until April 26, 2010, Mother and C.O. stopped allowing Mrs. W. to see J.D. as frequently.[7] Mrs. W. was told that J.D. was fishing with C.O.[8]

On April 27, when Mrs. W. and Mrs. S., Mother's mother, arrived at Mother's house, C.O. had J.D. in the car and was trying to leave with him because he knew that Mrs. W. and Mrs. S. were coming. The car stalled, and Mrs. W. saw J.D.'s face. She then went and shook her finger in C.O.'s face, told him that she was tired of this, uttered a cuss word, and said that she was going to do something. C.O. said nothing. Ultimately, C.O. removed J.D. from the car, and Mother and C.O. allowed Mrs. W. and Mrs. S. to take J.D. with them. Mrs. W. said that she picked up J.D. after C.O. removed him from his car seat and that he was walking stiff-legged. Mrs. W. said that J.D. "looked so horrible, I couldn't stand it." J.D.'s lip was swollen, his right ear was all black, he "had skinned places up his head," he had bruises on his chest, and he had bruises on his arms and back. Mrs. W. testified that J.D.'s injuries were all over his body and that when they touched him, "he would holler 'oh, oh[.]" Mrs. W. thought that

---

[7]Mother said that she was not getting along with Mr. and Mrs. W. and that was why they had not seen J.D. in two weeks.

[8]Mrs. W. believed that J.D. was fishing because she had taken him fishing, and he loved it.

11

he had broken ribs. Mrs. W. rated the injuries as past a ten. Mrs. W. said, "They told us it was rug burn," but she did not believe that explanation. Mrs. W. took pictures of J.D. because she believed that he had been beaten.

When they arrived at Mr. and Mrs. S.'s house, Mr. S. started screaming when he saw J.D. Mrs. W. left and returned later that evening with her husband so that he could see J.D.'s injuries; Mr. W. was upset by them. J.D. spent the night with Mr. and Mrs. S.

Mrs. W. stayed up all night, and the next morning on April 28, she went to the police station in Sansom Park, where she lived. She inquired about how to report child abuse and was told that it would need to be reported in Fort Worth if it had taken place there. The police gave her CPS's phone number, and she went home and called them. She asked the CPS worker whether she should take J.D. to the hospital, and the CPS worker told her that she could not tell her what to do.

### 2. The Emergency Room Visit

Mrs. W. decided to take J.D. to the hospital, so she drove to Mr. and Mrs. S.'s home and picked up Mrs. S. and J.D. and went to Cook Children's Medical

Center at 8 a.m.[9]  The nursing notes state that "upon entering room pt [patient] reports 'I hurt' [and] when asked who hurt him he states 'kiss[.]'"[10]

Dr. Jayme Coffman, the medical director of the CARE Team[11] at Cook's, testified that J.D. had arrived at the emergency room with numerous bruises and abrasions over his whole body, including in his mouth; abdominal tenderness; elevated liver enzymes; and "a compression fracture of his T-6 vertebral body."

Because the photographs that were admitted into evidence did not depict the injuries as severely as they had appeared first-hand, Dr. Coffman described J.D.'s injuries:  a large, blue-gray bruise on his right cheek; a smaller, one-centimeter bruise closer to the nose; two linear scabbed abrasions on his right cheek; a one-centimeter green bruise on his left cheek; an "abraded" upper lip; a torn frenulum (the little piece of skin that connects the upper lip to the gum); cracked and bleeding lips; bruising on the right side of his tongue and on the anterior tip of his tongue; abrasions on both sides of his soft palate; a three-by-two-centimeter red bruise with several linear abrasions on his chin; a one-centimeter bruise on his jaw line; a one-centimeter blue bruise on the bridge of

---

[9]Mrs. W. testified that J.D. did not have any new injuries when she picked him up from Mrs. S.'s house.  Mrs. W. did not know why Mother testified that J.D. had fewer injuries when he left her house than when he appeared at the hospital.

[10]"Kiss" closely resembles C.O.'s first name.  Mother testified that J.D. clearly pronounced C.O.'s first name and had never heard J.D. use a different pronunciation for C.O.'s first name.

[11]Dr. Coffman explained that the CARE Team is the child abuse program at Cook's.

his nose; small purple bruising on the inner part of his right ear; red bruising on the part of the ear that sticks out and extending to the hairline; purple bruising on the right side of the tip of his penis; a scabbed abrasion that was five-by-three centimeters on his left mid-thigh; a three-by-three-centimeter abrasion on his right lower back with four-by-four-centimeter redness adjacent to that; an abrasion that was starting to scab that was one-by-one-and-a-half centimeters on his lower back; a three-by-one-centimeter "over-scabbed" abrasion along his vertebral area on his mid-back; an abrasion that was almost resolved on his right upper back near the scapula; several one-centimeter red bruises on his right knee; a four-centimeter, linear scabbed abrasion and two linear scars on his right anterior thigh; multiple linear scabbed abrasions on his left lateral or side of his ankle; several small pustules[12] on his left big toe; a two-by-two-centimeter bruise on the left lower leg on the inner aspect; scattered petechiae[13] in both armpits; multiple one-centimeter bruises varying in color on the anterior of the chest; red petechiae were on top of a three-to-four-centimeter blue bruise on his left chest; four one-by-one-centimeter red bruises were on his left lateral forearm; two-by-three-centimeter red bruising with swelling or edema of his right elbow; and numerous scattered bruises on his legs.

---

[12]Dr. Coffman testified that these small pustules could "just be an infectious process, not necessarily injury."

[13]Petechiae, which are little red dots, are little broken blood vessels.

14

Dr. Coffman testified that there was no way to identify the size of the hand that had caused the bruises and that she could not precisely date bruises because so many factors affect the resolution, especially when there is bruising on top of bruising. Dr. Coffman said that the bruises that were blue and purple would have been caused in the "last few days," but that was as precise as she could be. She said that the bruising could have occurred the day before, the week before, or at both times. And the abrasions that had scabbed would have taken a few days to reach that level. Dr. Coffman concluded that the bruises appeared to be at various ages but were less than a week old; all of the bruises were gone when the doctor repeated a skeletal exam a couple of weeks later.

Dr. Coffman explained how J.D.'s injuries could have occurred. She said that a torn frenulum in a child J.D.'s age could be caused by a hit in the mouth or by something being jammed into his mouth; that a bruise on the tip of the penis is usually caused by pinching; and that the petechiae can be caused if a shirt bunches up and squeezes the skin or by someone squeezing the person under the armpits.

Dr. Coffman testified that J.D.'s elevated liver enzymes could have been the result of blunt trauma or certain viral illnesses. But Dr. Coffman testified that J.D.'s abdominal CT did not reveal any liver injury, and there was no indication of any other kind of illness.

Dr. Coffman explained that J.D.'s symmetric "compression fracture of the T-6 vertebral body" meant that the round part of the backbone "was squished

15

down, so it was flattened somewhat." Dr. Coffman said that such an injury requires a force going up the backbone, like slamming J.D.'s bottom down on something hard such that forces are transmitted up his back. Dr. Coffman said that the compression fracture would have caused J.D. to be fussy because it would have caused him pain. Dr. Coffman testified that an injury of this nature cannot be caused accidentally.

Dr. Coffman said that the injuries on J.D.'s back could have been caused by carpet burns or any number of things; there was no pattern to the injuries. Dr. Coffman said that a fall from a chair would not have caused all of J.D.'s injuries but could have caused some.

Dr. Coffman said that in the days preceding the trip to the emergency room, the bruising on J.D. would have been noticeable to a layperson. In Dr. Coffman's opinion, a reasonable person would have noted that J.D. needed medical treatment. Dr. Coffman had no doubt that someone or multiple people had beaten J.D., who was just a couple days shy of his third birthday when he was seen in the emergency room. Dr. Coffman believed that J.D. had suffered Battered Child Syndrome, meaning that he had been beaten over time. Dr. Coffman testified that whoever had knowledge that this was going on did not protect this child, and therefore, it was not safe to return the child to his caregivers.

### 3.  CPS Investigation

Kriste Moron, an investigator with Child Protective Services (CPS), testified that she was assigned the case involving J.D. and K.O. after CPS had received multiple referrals stating that J.D. had numerous injuries; there were concerns that he was being abused and that there was domestic violence in the home. When Moron arrived at Cook's, she tried to speak with J.D. while he was being treated for his injuries, but he could not communicate clearly enough to be interviewed.  Moron interviewed Mrs. S. and Mrs. W., who gave information consistent with the facts set forth above.

Moron met with Mother and C.O., who both initially denied that J.D. had any injuries prior to being picked up by his grandparents.  Later, Mother told Moron that J.D. had fallen from the table and had hit his face on the table and had busted his lip.  Mother also said that J.D. had chapped lips.  Mother said J.D. had a cut on his face from falling while retrieving a kite out of the closet.  At first, Mother said that she saw the incident but later said that she was only told about the incident by C.O.  Mother said that the injuries on J.D.'s back were caused when he received carpet burns while he was playing with C.O.  Mother did not know what had caused the injuries to J.D.'s chest, but she said that C.O. had previously left bruises on J.D.'s chest when he had played too rough with him and had punched him in the chest.  Mother said that the current bruises on J.D.'s chest were not the same bruises that she had observed after C.O. had punched him in the chest while playing with him.  Mother had no explanation for any of

J.D.'s other injuries. In Moron's opinion, Mother did not seem to be too concerned about J.D.'s injuries and did not seem to be protective of J.D.

Moron asked Mother and C.O. about domestic violence, and Mother said that there was one incident a month or two prior to her giving birth to K.O. during which C.O. had punched her in the face, causing a bruise on her face. C.O. said that he had never been involved with domestic violence.[14]

C.O. told Moron that he saw J.D. fall from the table and hit his forehead on the table. C.O. also talked about J.D.'s falling while trying to get a kite but said that he did not actually see J.D. fall. C.O. said that Mother had told him that he played too rough with J.D., but C.O. denied having caused any of J.D.'s injuries or knowing how they were caused.

Neither Mother nor C.O. had an explanation for how J.D.'s compression fracture had occurred. Both Mother and C.O. reported that J.D. was clumsy and that he ran into walls and fell down a lot. Both denied that J.D. had been crying or fussy or had acted hurt before he was taken to Cook's.

Moron testified that because Dr. Coffman could not date J.D.'s injuries, Moron decided not to place the children[15] with the grandparents or great-

---

[14]C.O., however, reported to Moron that he had previously been involved with other types of criminal activity; he had been involved with a gang, had been shot during a gang shooting, and had previously used marijuana but had stopped.

[15]K.O. was removed because there was a risk of physical abuse, but there was no evidence of her having been abused.

18

grandparents in case J.D. had sustained his injuries while he was with them. During the interviews, Moron did not know who had injured J.D., but she was concerned about the inconsistencies in the explanations that she had received from Mother and C.O. regarding J.D.'s injuries. Moron ultimately concluded that Mother and/or C.O. had caused J.D.'s injuries because they were J.D.'s only caregivers, but Moron could not establish that any specific injury on J.D. was caused by Mother.

### 4. Mother's Service Plan

Tyra Sasita, the conservatorship worker assigned to the case in late April or early May 2010, testified that she had developed service plans for Mother and C.O. Sasita testified that Mother's service plan required her to complete random drug testing, which she did;[16] to attend her weekly visitation, which she did;[17] to participate in a domestic violence group, which she did; to undergo a drug and alcohol assessment, which she completed; to participate in individual counseling,

---

[16]Sasita gave Mother random drug tests, and she tested negative. Sasita testified that drug use was not an issue in this case.

[17]Although Sasita had not had an opportunity to observe the visits, she had received notes from the case aide, and nothing had occurred during the visits that would cause Sasita to request that the visits be canceled or suspended. Sasita had received reports from the visits that Mother had brought things for the children to the visits. During the visits, however, she was unable to control J.D. He stood on chairs and called her a "poopoo-head," and she was unable to redirect him. Sasita testified that J.D.'s aggression increased after visits.

which she did until she was discharged;[18] to provide safe and stable housing, including food, and employment for six consecutive months in order to achieve reunification, which is set forth in more detail separately below; to participate in the Shaken Baby Alliance, which she did not complete because of scheduling problems;[19] to participate in parenting classes, which she did; to complete a psychological evaluation, which she did; to follow all of the recommendations on her psychological evaluation, which she had not done; to cooperate with the detective who was working her criminal case,[20] which she had not done; and to participate in anger management classes, which she did. Sasita also testified

---

[18]Sasita explained that after receiving notes from Mother's counseling session with the Parenting Center, Sasita did not feel that they were addressing the issues that would be helpful in this case, including the domestic violence issue, the issues of what happened to J.D., the issues with her relationship with C.O., and the issues of resolving the CPS situation. After Mother had completed twelve sessions, Sasita asked that Mother complete another round of sessions with another counselor named Norma Bartholomew. Mother attended the sessions but made "very limited" progress with Bartholomew. After going through two rounds of counseling, Mother continued to state that J.D.'s injuries were the result of his falling off a chair and clumsiness and that she believed that her mother had caused J.D.'s injuries. Mother was ultimately discharged from counseling due to "lacking insight." Sasita testified that Mother had to be able to demonstrate that she could protect her children, and she could not do that because she would not process in counseling that C.O. could have caused J.D.'s injuries.

[19]Sasita was not able to reach the instructor for the Shaken Baby class, and she did not hold Mother accountable for completing that requirement on her service plan.

[20]The particular criminal case was not specified.

that Mother had failed to remove herself from the person that the detective said had probably caused the injuries to J.D., but this was not part of her service plan.

Sasita testified that given the serious injuries that J.D. presented with, the Department would not consider returning the children to Mother and C.O. if they only completed their services; the Department wanted to know what had caused J.D.'s injuries so that the Department could come up with a plan. Mother told Sasita that she had not seen bruising on J.D.'s body when she bathed him. Sasita said that it was not possible for Mother and C.O. not to know about any of J.D.'s injuries because the medical reports noted that some of the injuries were old.

Sasita had not learned at any point that Mother had laid hands in anger on J.D. Mother told Sasita that C.O. did not cause J.D.'s injuries. Mother would not entertain the idea that C.O. had caused J.D.'s injuries and would say only that they played rough together.

Instead, Mother gave Sasita several explanations for J.D.'s injuries; she blamed Mr. and Mrs. S. and Mr. and Mrs. W., though Mother had never made a police report stating that any of these people had caused J.D.'s injuries. Mother also blamed J.D.'s falling from a chair, but that explanation did not line up with J.D.'s injuries.

### 5. Mother's Housing

Sasita described Mother's housing situation during the pendency of this case as "very unstable." At the time of the removal, Mother and C.O. had an

21

apartment together on Avril Court and reported that address in October 2010. In December 2010, Mother provided an address on Isbell Road for her and C.O. On April 29, 2011, the Friday preceding the termination trial, Mother told Sasita that she was living on Avril Court with Debbie Thompson. When Sasita visited Mother's home, she noted that it would need another bedroom in order to accommodate Mother and the children. Mother told Sasita that she had been living on Avril Court for a month and that she had moved out from C.O. because she wanted her children back. Sasita, however, believed that Mother was still in a relationship with C.O. and was living with him on Isbell Road at the time of the trial.[21]

### 6. Mother's Testimony

### a. J.D.'s Injuries

Mother testified consistently with what she had told Moron regarding the injury to J.D.'s face from hitting the closet door while retrieving a kite and the injury to his lip and forehead from hitting the table. Mother said that she was present when Mrs. W. and Mrs. S. showed up to pick up J.D. Before J.D. left with them, Mother

> noticed his lip. He had on his forehead the cut on his face or a scratch, and then his ear, it only, like, in the day, it would be fine, but I guess when he was asleep at night he would pull on it and he would wake up with his ear all bruised, and then he had some

---

[21]C.O. told Sasita that Mother had moved out a week prior to the trial at the direction of her attorney to show that she was no longer with C.O. so that she could get her children back.

22

scratches on his legs and stuff from him falling and everything, and he had a bruise underneath his eye. My son used to demonstrate how he liked to hit himself, and I would stop him from doing that, and then he had some, the carpet burn on his back from him playing, from them playing and everything, and [J.D.] didn't like to wear a T-shirt, and then I never noticed anything else.

Mother summarized that J.D. had sustained six injuries while in her care: a scrape on his face from falling in a closet while trying to get a kite, a little bruise underneath his eye, carpet burns on his back from playing around, scrapes and bruises on his knees from playing, a bruise on his back from falling on a toy, and a busted lip from falling and hitting the table. Mother said that none of J.D.'s injuries were of concern to her.

Mother did not know how J.D. had received a bruise on his penis. She said that he "used to grab himself pretty hard right there." She and Mr. and Mrs. W. had potty-trained J.D., but he had "kind of back-slid" whenever she gave birth to K.O. Mother did not pinch him to get him back on track.

Mother testified that she never laid hands on J.D. in anger and that she never saw C.O. lay hands on J.D. in anger. Mother testified that she had spanked J.D. a few times on his bottom with her hand. Mother started doing that when he was about two and a half whenever he would not listen or wanted to do things that he was not supposed to, like climbing on things. Mother had not seen C.O. spank J.D. Mother had observed C.O. playing roughly with J.D. and had told him that he had to "stop that" and to calm down. Mother admitted that she had intervened on occasion to stop C.O. from playing too rough with J.D. Mother

23

thought that C.O. may have caused some of J.D.'s injuries when he played rough with him. But Mother did not think that C.O. could have been the perpetrator of any of J.D.'s nonaccidental injuries; Mother said that it had never entered her mind that possibly C.O. could have caused J.D.'s injuries. Mother was aware that J.D. had told a Department employee that C.O. had hurt him, and she believed that J.D. was "replaying back to when [C.O. and J.D. were] playing . . . rough and everything." Mother had never seen J.D. scared of C.O., and J.D. had never told her that C.O. had hurt him.

Mother believed that someone had severely beaten J.D., but she was not sure who. Mother testified that the pictures she saw of J.D.'s condition while in the hospital revealed more bruises than he had when he left her house. Mother explained that she believed that Mrs. S. had injured J.D. because he was "just fine" whenever he left Mother's care; afterwards, he was taken to the hospital, was found to have "new injuries," including that he could not eat and that his back was hurt. Mother said that J.D. was eating "just fine" when he left her house, was not complaining about his back, and was cheerful and playful. Mother believed that Mrs. S. had caused some of J.D.'s bruises, including the ones on his arms and his penis; had caused his back injury; and had caused his eating problems. Later in her testimony, Mother would not say that Mrs. S. had beaten J.D.; Mother would say only that she believed that J.D. had received some of his injuries while he was at Mrs. S.'s home.

24

Mother testified that she had allowed J.D. to leave with Mrs. S. on April 27, 2010, because she believed family could be trusted and because J.D. had previously spent the night with Mrs. S. without incident. Mother said that C.O. did not want J.D. to go to Mrs. S.'s house because he knew of her drug habit,[22] so he called Mother first to see if it was okay. She admitted that it was her fault for letting J.D. go with Mrs. S.[23] Mother took responsibility for J.D.'s injuries, stating, "I'm his mom and I should have been there for him."

### b. C.O.'s Gang Affiliation

Mother said that C.O. had been in a gang before he met her. Mother said that C.O. had told her that the scar on his head was from a gunshot that he had received while he was in a gang. Mother had not asked C.O. what gang he was in or when he was shot. She agreed that she did not know a whole lot about C.O. and that she should have known more about him before she moved in with him and had a baby (K.O.) with him. Mother said that she would like to know more about C.O.'s past, but she did not feel like she had placed her children in danger by not knowing his past. Mother had asked C.O. if he was still associated with the gang, and he said he was not; Mother took him at his word.

---

[22]Mother said that Mrs. S. had been a drug user all of Mother's life and that Mother was raised by Mrs. W.

[23]Mother said that K.O. did not go with J.D. to Mrs. S.'s house because she was "just a baby," and so they kept her at home. C.O. had reservations—due to Mrs. S.'s drug use and drinking—about K.O.'s going to Mrs. S.'s house, so he kept her home.

### c. Domestic Violence

At the beginning of the termination trial, Mother agreed that C.O. is her boyfriend and that he had been her boyfriend for about two years at that time. Mother said that she felt safe around C.O. but admitted that there was one incident when he had hit her. Mother said that when she was seven or seven and a half months' pregnant, C.O. had slapped her during an argument over finances and that it was a one-time event. Mother said that the slap did not make her eye black or leave a mark or a bruise. Mother testified that she took a walk after the incident and that then they came back and talked about the fight; Mother did not call the police. Mother said that C.O. did not give her a black eye when she was pregnant with K.O., and Mother had no concerns about C.O.'s being physically violent.

### d. C.O.'s Parenting

Mother testified that J.D. was four years old at the time of the termination trial and that C.O. had been caring for J.D. for the two years that she had been with C.O. J.D. liked to play with his toys, go fishing, go outside and play, and watch television. J.D. watched wrestling and liked to wrestle with C.O. Mother believed that her children would be safe around C.O. without supervision. Mother testified that in her mind, C.O. was a possible placement for both of her children. Mother had no concerns about C.O.'s parenting her two children because she had never seen him as a bad parent. Mother, however, was concerned about whether C.O. could take care of the children financially. Mother

26

did not know why she had initially picked her grandparents over C.O. to take care of her children. She ultimately concluded that she would like K.O. to be with C.O. over her grandparents.

### e. Mother's Services, Residence, and Employment

Mother testified that she had complied with all of CPS's requests. Mother thought that she had done "pretty good" in her individual counseling sessions with Bartholomew but that she did not really ask much because she had already been through counseling before. Mother was not aware that she had been discharged from counseling because she was not making progress; Bartholomew told her that she had been discharged because she did not need counseling any more. Mother said that she had learned things during the parenting course and that she would call the police if her children were ever placed in danger or injured by C.O. Mother said that if she was given the opportunity to continue parenting her son, she would be much more observant and protective as a result of what she had learned in her parenting classes.

Mother testified that she had moved in with "a good friend" named Debbie before the termination trial started because Mother had realized that she needed "to do [her] own thing" in order to have her children returned. Mother testified that her current address was on Avril Court South and that she had provided Sasita with the current address on Wednesday or Thursday of the week before the termination trial had started. Mother testified that there were two bedrooms in the apartment and that Debbie's three children were there on the weekends.

Mother did not know anything about Debbie's background but said that she had known her since ninth or tenth grade. Mother agreed that there would be seven people living in a two-bedroom apartment if the trial court returned her children to her. Mother said that C.O. would help her out financially if she was kicked out by her roommate.

Mother testified on the first day of trial that she had worked at Sprouts Farmers Market since January 10, 2011; that she made $8.91 an hour; and that she worked twenty-six or twenty-eight hours per week. Approximately five weeks later, on the second day of trial, Mother testified that she had left Sprouts because they were not giving her enough hours. After Mother left Sprouts, she was unemployed for two weeks; she did not know why she had left a job that gave her at least ten hours for no job. Mother had $200 saved up when she left Sprouts. On the second day of trial, she testified that she was working full-time at Green Monster, a solar company. She had been working there for about a week. Mother said that she made about $400 per week. Mother's rent was $550 per month, but Debbie paid it; Mother helped out with the bills by paying $300. Mother had about $100 saved up. Mother had received a tax refund of $2,360 in January 2010, but she could not recall what she had done with the money. In January 2011, Mother received a tax refund of $3,050 and bought a car, which she returned in April 2011 because she could not make the payments. Mother testified that she did not have health insurance for her children.

28

### f. Mother's Plans

At the start of the termination trial, Mother said that if her children were returned to her, she would not continue a romantic relationship with C.O. and that she had sat down and talked about that with him. Mother said that if she did not get her children back, she was not sure whether she was going to continue her relationship with C.O.; she said, "We haven't figured that one out. Probably not." Mother said that she and C.O. had been talking "for a while" about having to end their relationship so that she could keep her children. Mother admitted that her preference was for the children to be returned to her to be cared for jointly by Mother and C.O. On the second day of the termination trial, Mother said that she and C.O. were no longer together and that she did not talk to C.O. at all. The last time that she had spoken with him was when she moved out.

Mother testified that the biggest mistake that she had ever made was not protecting her children enough. Mother believed that she had done everything she could do to get her son back, including separating her residence from C.O.'s. Mother asked the trial court to return her children to her and she said that she could prevent C.O. from being around J.D. Mother said that Mr. and Mrs. W. could watch her children while she worked.

If the children were placed with relatives, Mother agreed that she would pay child support. Mother had indicated to Sasita that if the children were placed with Mr. and Mrs. W., she would go get the children, despite the great-grandparents' efforts to protect the children. Sasita told Mother that she would

29

not have permission to take her children, and Mother agreed that was not an option.

### 7. C.O.'s Testimony

C.O. was in a gang from age twelve through age eighteen or nineteen when he was shot. C.O. testified that after he was shot in the head by a rival gang, he had not been affiliated with any gangs.[24] C.O. testified that he had not been in trouble with the law since the injury. Prior to disassociating from the gang, C.O. pleaded guilty to the following offenses: escape, which occurred August 7, 2002; driving while intoxicated, which occurred August 29, 2002; assault/bodily injury to a family member, which occurred on October 1, 2005;[25] and possession of marijuana under two ounces, which occurred on November 22, 2008.[26] The judgments from the four offenses were entered into evidence.

C.O. underwent a psychological evaluation and was diagnosed with adjustment disorder with depressed mood and psychotic disorder. One of the recommendations was that he be treated for hallucinations.

---

[24]Sasita verified that C.O. received food stamps and disability for being shot in the head by a rival gang.

[25]C.O. testified that he had assaulted his ex-girlfriend by slamming her head against the trunk of an automobile. C.O. said that he slapped his ex-girlfriend because she would not get out of his way. He said, "Really, I didn't do nothing. I slapped her." C.O. also testified that he had slapped Mother once because she would not move out of the way and was blocking the door.

[26]C.O. pleaded the Fifth Amendment regarding when he had last used marijuana.

C.O. said that Mother was nurturing and was a good parent.  He never saw Mother injure J.D.  C.O. pleaded the Fifth Amendment when asked whether he had injured J.D.[27]

C.O. testified that J.D. had told him, "Grandma beat me," meaning that Mrs. W. beat him.  C.O. however never saw Mr. or Mrs. W. mistreat the children or physically abuse Mother.  And C.O. never took J.D. to the doctor for injuries that he had allegedly received at Mr. and Mrs. W.'s house.

C.O. testified that he lived on Isbell Road at the time of the termination trial and that Mother had lived with him until two months before the June termination trial.  C.O. testified that he and Mother were not a couple and no longer spent time together.  C.O. later admitted that since the May 2 court date, Mother had come over to his apartment on court days.

### 8.  Support System

The intervenors were ages sixty-nine and seventy-two.  When Sasita visited Mrs. W. at her home, she showed Sasita pictures of past injuries to J.D. and talked about how J.D. would act out the abuse that was going on in his home.  The Department ultimately decided not to place the children with the intervenors because of their motivation to protect the children, their ability to protect the children, their lack of a viable backup caregiver, their awareness of

---

[27]Sasita testified that there was no ongoing criminal investigation regarding C.O. as the perpetrator of J.D.'s injuries.

past injuries, their ages, and their present belief that they should not have contacted CPS.

Mrs. W. testified that she had raised Mother since she was fourteen or fifteen and that Mother had lived with her off and on through nearly all of J.D.'s life. Mrs. W. babysat J.D. while Mother was in school or at work. She said that he was a handful but that she enjoyed it. Mrs. W. testified that she was willing to give J.D. the extra attention or help that he required as a result of his behavioral issues.

Mrs. W. said that Mrs. S. had separated from her husband during the week of trial because he had tried to choke and kill her and that there were previous incidents of domestic violence in Mr. and Mrs. S.'s home. Mrs. W. had talked to Mother while the children were in care, and Mother had kept saying that Mrs. S. had inflicted the injuries on J.D.

Mrs. W. testified that she did not take action when J.D. had the first black eye or the second black eye because she did not know what to do; Mother kept giving her excuses. However, in Mrs. W.'s mind, she had no doubt that C.O. had caused J.D.'s injuries because J.D. had told people, "[C.O.] hurt me." Mrs. W. admitted that she wished that, instead of calling CPS, she would have taken the children to a lake lot that she and her husband own. However, Mrs. W. agreed that had CPS not gotten involved in the case, J.D. would more than likely still be stuck in a home with a "stepfather" who was beating him.

When Mrs. W. asked Mother about the black eyes that she had received, Mother told her to stay out of it. Mrs. W. believed that C.O. had caused Mother's black eyes while she was pregnant and the bruises on her chest when she delivered, but Mrs. W. did not call the police to report that domestic violence was occurring around J.D. Mrs. W. said that she did not know what to do and could not prove anything.

Mrs. W. did not think that C.O. would beat K.O. because she was his biological child, but Mrs. W. believed that C.O. would beat up J.D. It bothered Mrs. W. that Mother had never admitted that C.O. was beating J.D. Mrs. W. could not figure out if Mother and C.O. were still a couple; she did not trust that they had broken off their relationship. Mrs. W. believed that Mother was choosing C.O. over her children. Mrs. W. testified that Mother had received a lot of chances over the year to get her life together, but she had not done so.[28] Mrs. W. testified that as long as Mother is with C.O., the trial court should not return the children to Mother. Mrs. W. did not want to see the children adopted; she wanted them to come home with her and her husband.[29]

Mr. W. testified that he had observed injuries on J.D. He said that every time he touched J.D. he said, "[D]on't hurt me, don't hurt me." Mr. W. testified

---

[28]However, Mrs. W. believed that some of Mother's services may have helped her.

[29]Mrs. W. admitted that she and her husband might have engaged in domestic violence when they were young. She said that she would "[m]ore than likely" call the police if he hit her again.

33

that he did not see C.O. inflict J.D.'s injuries, but he believed that C.O. had caused them.  He believed that Mother had failed to protect J.D.  Mr. W. believed that C.O. had also beaten Mother and had caused her black eyes and bruises; Mother had told him to stay out of it.  Mr. W. did not call the police because he was not thinking back then; he was mad at C.O.  He regretted not doing something to protect J.D.  Mr. W. asked the court to place the children with him and his wife and testified that was in the children's best interest.

The intervenors' adult son Jeffery lived with them and testified that he had not called the police when Mother moved in with C.O. and came back to visit with bruises on her arms and black eyes although he believed that C.O. had hit her. He also did not call the police when he saw J.D. with black eyes.  Jeffery said that Mother and C.O. were in a dating relationship and were living together.

### 9.  Children's Status

At the time of the termination trial, the children were living in a dual-licensed foster home.  Sasita said that K.O. was doing very well, was on target, was growing, and was thriving; there were no issues or concerns with her.  J.D. was not on any medications but was receiving "a lot of therapies," including speech therapy, physical therapy, occupational therapy, and play therapy.  Sasita said that J.D. was delayed and thus did not have the cognitive ability of others his age.  According to Sasita, J.D. "continues to struggle with violence and violent behaviors.  He acts out behaviors, he has a real problem with women and how he treats women, being disrespectful to them."  He acted out violently, including

34

hitting and tripping his sister. During his play therapy sessions, J.D. also acted out the abuse that Mother had gone through and the abuse that he had endured. Sasita said that "the current placement has definitely gotten the services, but it has been very challenging to deal with [J.D.'s] behavioral issues."

### 10.  Department's Plan

Sasita asked the trial court to terminate Mother's parental rights to J.D. and K.O. and stated that it was in the best interest of the children. The Department's plan was not for the current foster family to adopt the children; instead, the Department planned to pursue another placement for the children.

### 11.  CASA Volunteer's Report

Alicia Miller, the Court-Appointed Special Advocate, was appointed on the case in July 2010. Miller testified that the children were "doing great" in foster care and that they were in "a very good placement." Miller said that J.D. is a very active little boy and is "all boy all the time." Miller said that J.D. is not one to sit still, likes to be moving and playing with things, and is very physical. The foster mother had to keep an eye on J.D. at all times. Miller testified that J.D. was making "tremendous progress" in speech and that K.O. was on-target for motor skills and language. Miller was concerned that Mrs. W. had failed to involve law enforcement when she saw injuries on J.D. Miller recommended that the children be placed for adoption and testified that was in their best interest.

## B. Standard of Review

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;

> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

> (C) guidance and supervision consistent with the child's safety;

> (D) a safe physical home environment;

> (E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and

> (F) an understanding of the child's needs and capabilities;  and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)   the desires of the child;

(B)   the emotional and physical needs of the child now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the best interest of the child;

37

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)      any excuse for the acts or omissions of the parent.

*Holley*, 544 S.W.2d at 371–72 (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## C. Sufficient Evidence Exists That Termination of Mother's Parental Rights Is In Children's Best Interest

Here, Mother argues that it was not in the children's best interest to terminate her parental rights because she had completed her service plan and had moved out from C.O. These two arguments, however, do not outweigh the *Holley* factors and section 263.307(b) factors, which we analyze below.

The record does not disclose the desires of the children, but it does reflect that J.D.'s aggression increased after visits with Mother. Due to their young ages, the emotional and physical needs of the children included the need for

protection from physical abuse, and J.D. needed therapy for the abuse that he had endured and the abuse of Mother that he had witnessed. Mother had demonstrated that she was incapable of protecting herself and J.D. and that she had difficulty controlling and redirecting him when he misbehaved at visits. Mother had taken advantage of the services that she was offered but reached a stalemate in counseling when she would not consider that C.O. had abused J.D. Mother admitted that she had failed to protect J.D., but her failure to acknowledge the danger that C.O. and his friends posed to J.D.—even after admitting that C.O. had left bruises on J.D. while roughhousing and that she had repeatedly asked him to stop playing so rough with him—indicated an ongoing danger to J.D. Mother wanted the children returned to her or to C.O. or to her grandparents and contended that right before the termination trial started, she had separated from C.O. and had established a residence of her own, though CPS and Mother's relatives did not believe that she had cut ties with C.O. CPS, however, planned for the children to be adopted but not by the family that was fostering the children; thus, CPS's proposed placement was unknown at the time of trial. Overall, the *Holley* factors do not weigh in favor of Mother.

The evidence also does not weigh in favor of Mother with regard to the section 263.307(b) factors. The children were ages four and one at the time of the termination trial. J.D. received speech therapy, physical therapy, occupational therapy, and play therapy; he was developmentally delayed and did not have the cognitive ability of others his age; and he struggled with violent

39

behaviors, including hitting and tripping. The record, as set forth above, reveals that J.D. had witnessed C.O. beating Mother because he had acted it out in play therapy. K.O. was on target, was growing, was thriving, and therefore did not receive any therapy.

The record reveals a history of abuse directed at J.D., presumably by C.O., who kept J.D. while Mother worked or went to school and whom J.D. mentioned as the perpetrator. Mrs. W. testified that after Mother moved in with C.O., J.D. came to her house with bruises and said that C.O. had hurt him. This is some evidence that J.D. could be fearful of returning to the home, though Mother testified that J.D. had never acted scared of C.O. Mrs. W. also testified that J.D. came over with a black eye on two occasions, that he came over with the whole side of his face black on one occasion, and that he appeared with numerous injuries on April 27, 2010. The page-long list of injuries set forth above, detailing J.D.'s condition when he appeared in the emergency room on April 28, 2010, were not all explained by the instances that Mother and C.O. had described. No new injuries were mentioned after J.D. was taken into foster care by CPS.

The record also details a history of abuse of Mother by C.O. C.O. admitted slapping Mother once because she would not move out of the way; Mother described an event in which C.O. slapped her while she was seven and a half months' pregnant because they were arguing over finances. Mrs. W. testified that Mother appeared at her baby shower for K.O. with two black eyes; Mother denied this. Mrs. W. testified that she had previously seen bruises on Mother's

chest, legs, and arms. Mrs. W., Mr. W., and Jeffery believed that Mother was being beaten by C.O., though Mother blamed her injuries on J.D.'s kicking her or her running into a door or a chair. The record also disclosed that C.O. had pleaded guilty to assault/bodily injury to a family member in 2005; he testified that he had assaulted his ex-girlfriend by slamming her head against the trunk of an automobile and slapping her because she would not get out of his way.

With regard to a history of substance abuse, C.O. had previously been convicted for possession of marijuana, and he pleaded the Fifth Amendment when asked when he had last used marijuana. The results of Mother's psychological evaluation were not presented, but C.O.'s psychological evaluation revealed that he had been diagnosed with adjustment disorder with depressed mood and psychotic disorder. One of the recommendations was that he be treated for hallucinations.

The record demonstrated that Mother had completed the bulk of the services on her service plan. Mother said that she had learned during the parenting course and that she would call the police if her children were ever placed in danger or injured by C.O. But, as mentioned in the *Holley* factor analysis above, after completing two rounds of counseling, Mother would not entertain the idea that C.O. had caused J.D.'s injuries and instead blamed them on her mother, her mother's husband, and her grandparents, though she had never made a police report stating that any of these people had injured J.D.

41

The record also did not demonstrate that Mother had effected positive environmental and personal changes or that she had adequate parenting skills. Although Mother said that she had moved into an apartment with her friend Debbie, neither CPS nor Mother's extended family was convinced that Mother had fully separated from C.O. By failing to achieve six months of separation from C.O., Mother could not demonstrate that the children would no longer witness domestic violence if they were returned to her. Even assuming that Mother had moved from her home with C.O. in April, she had been living on her own for only two months at the time the termination trial concluded, and the two-bedroom apartment that she was sharing with Debbie would need another bedroom to accommodate Mother and her two children in addition to Debbie and her three children.

With regard to Mother's parenting skills, she had failed to protect K.O. by continuing to live with C.O., who had hit Mother while she was seven and a half months' pregnant with K.O.; she had failed to protect J.D. from C.O. and from C.O.'s friend; she denied seeing any bruises when she had bathed J.D., even though some of his bruises had been inflicted up to a week before the trip to the emergency room and were so numerous that his condition was ruled Battered Child Syndrome; she hid J.D. from Mr. and Mrs. W. for a three-week period; she did not appear concerned when J.D. appeared in the emergency room for treatment of his numerous injuries; and she was unable to control J.D. and redirect him when he misbehaved during visits. And though Mother's support

42

system included her grandparents, they were rejected as a possible placement because they had seen bruises on J.D. on multiple occasions and had not reported the abuse.

Considering the relevant *Holley* factors and the relevant statutory factors in evaluating Mother's willingness and ability to provide the children with a safe environment, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship between Mother and the children is in the children's best interest. *See K.A.S.*, 131 S.W.3d at 226–30 (holding evidence legally and factually sufficient to support trial court's best interest finding because, among other things, mother had failed to protect children from father and had not shown ability to stay away from him; there was a history of domestic violence issues; father had sexually abused child; and abused child needed safe, stable environment because of mental and emotional issues). We overrule the first portion of Mother's fifth issue.

## D. Failure To Place Children With Relatives Is Not A Ground For Reversal

In the latter portion of Mother's fifth issue, she challenges the Department's placement of her children outside the family. This is not a ground for reversal on appeal.[30] *See In re H.S.B.*, No. 02-10-00324-CV, 2011 WL 1434948, at *1 (Tex. App.—Fort Worth Apr. 14, 2011, no pet.) (mem. op.) (citing *C.H.*, 89 S.W.3d at

---

[30]The intervenors did not appeal.

43

28, and explaining that TDFPS has no duty to make placement with relative before parent's rights can be terminated; the fact that placement plans are not final or that placement will be with nonrelatives does not bar termination); *In re C.C.*, No. 02-04-00206-CV, 2005 WL1244672, at *6–7 (Tex. App.—Fort Worth May 26, 2005, no pet.) (mem. op.) (same).  We therefore overrule the remainder of Mother's fifth issue.

## VII. CONCLUSION

Having sustained Mother's third issue, thereby permitting review of Mother's first, second, and fourth issues, and having overruled those issues and Mother's fifth issue, we affirm the trial court's judgment terminating her parental rights to J.D. and K.O.

SUE WALKER
JUSTICE

PANEL:  WALKER, MEIER, and GABRIEL, JJ.

DELIVERED:  August 2, 2012